310-0783 Professional Transportation v. Gary Clark Counsel, you may proceed. May it please the Court, Counsel. My name is Valerie Pyler and I represent the employer appellant, Professional Transportation. The employer appeals from only those portions of the Commission decision which it believes are contrary to the manifest way to the evidence, specifically those portions that deal with the award of a permanent total disability and the award of medical costs. Turning to the facts of the case and the evidence thereof, Mr. Clark was 60 years of age and drove a family-type van for the employer in 2003. After working for the employer for a relatively brief period of time, he injured his right knee while in the course of his employment. He was eventually prescribed a right knee replacement surgery and his doctors recommended that he undergo a concurrent left knee replacement surgery so that the surgeries could be completed at the same time. During that surgery, the employee developed a blood clot and also suffered from multiple panic attacks. According to the hospital's medical records, Mr. Clark had a history of panic attacks. At the conclusion of his care, Mr. Clark was released to return to work by his treating orthopedist, Dr. Sheinkopf, as well as the employer's examining physician, Dr. Cohen. Each of these doctors released Petitioner to perform at least sedentary work. The employee's own expert, Dr. Fletcher, also released Petitioner to perform sedentary work. And FCE showed Petitioner capable of perhaps working at even greater level than sedentary. The employee, however, felt he was completely incapable of working and his job search therefore consisted of scanning the papers. He testified he particularly scanned the Sunday papers. He never applied for any jobs that he reviewed in those papers. The employee did not introduce any evidence from a vocational expert regarding the availability of jobs for someone of Petitioner's age, experience, education, etc. The employer introduced the testimony of Mr. David Wolfe, a vocational expert, regarding the availability of a stable labor market to an individual such as Mr. Clark. Mr. Wolfe noted that Mr. Clark had a long work experience and very skilled jobs, as well as college education, and just in the context of a labor market survey, identified one field of work, which was an automobile dealership cashier, that Mr. Clark could perform easily with his sedentary work restrictions. Now, is it your opinion, Mr. Wolfe's opinion helps your cause? I believe it does, Your Honor. I understand that there is a concern because he found that there were no transferable skills. Exactly, and that he's not employable in a regularly well-known branch of the labor market. But he did, that was a general overall consensus utilizing his skills as the air traffic controller, and then his subsequent work with the weather, and then his van experience. So how does Wolfe help you, again? Because he does identify an unskilled job position in which there is a stable labor market, which is the cashier position. And again, Mr. Wolfe was not providing a comprehensive vocational effort. He was only providing a labor market survey for a limited field of work to demonstrate that with very little effort, the petitioner could have matched his prior wage level in a position that was clearly within his age experience education. Was Mr. Wolfe able to find the petitioner a job as a cashier? Mr. Wolfe did not participate, as I said, as a vocational expert. Mr. Wolfe's participation was limited to the production of the labor market survey. Did he identify, you know, any place in the job market where the petitioner might find a job? Yes, sir. He provided and he identified and those leads were provided to Mr. Clark for those nine automobile dealership positions. And Mr. Clark did testify that he at least sent resumes to those nine. And he didn't get a job. Well, he was, he sent, he did not get a job out of those nine, correct. But in the whole six months or nine months between his released sedentary work by his own physicians and the date of hearing, that was his entire job search in terms of active jobs. He did no job search at all on his own. All he did was follow up on the nine leads that were provided through the labor market survey. And the record does not show that he ever requested any vocational assistance either. Mr. Clark was making a relatively low wage. Those kinds of jobs, particularly in this period of time, were relatively plentiful as shown by Mr. Wolfe's ability to identify, even in the Kankakee area, this easily identified position of sedentary work. How do you mean he was making a low wage? Pardon? What do you mean by a low wage? Wouldn't he have paid seven something an hour and 20 cents a mile? I believe his average weekly wage is less than $400 per week. Okay. Going to the commission proceedings, the matter was initially heard by Arbitrator Dollison on February 9, 2007. Arbitrator Dollison found that the condition of the employee's right knee and the pulmonary embolism were causally connected to the work injury. No other conditions of ill being were found to be causally connected. Arbitrator Dollison further concluded Petitioner had failed to prove that there was no reasonably stable labor market because he had provided neither a vocational expert's testimony, nor had he engaged in an adequate or even meaningful job search. Accordingly, Arbitrator Dollison awarded 65% loss of use of the right leg. And as to the medical expenses, Arbitrator Dollison found that there was no way to decipher what percentage of the introduced medical expenses pertained to the right leg, which was compensable, and the left leg, which was not. Accordingly, he just essentially split the baby and awarded 50% of the medical costs that were introduced into evidence. And the arbitrator computed that as $88,637.65. The employee filed a review of this award as to the permanency and the amount of medical costs. On review, the commission agreed that the record was completely devoid of the information needed to accurately assess which medical costs were causally connected and which were the result of the unrelated injury or the unrelated condition to the left leg. I mean, the commission actually used the words devoid of sufficient evidence. Accordingly, they remanded to the arbitrator to take additional evidence, thereby giving Petitioner yet another opportunity to meet his burden of proof. On remand, the matter was actually heard by Arbitrator Giordano. Arbitrator Giordano took no additional evidence. In fact, there is no record of proceedings for that second proceeding of arbitration anywhere in the record. Arbitrator Giordano stated in his decision that he reviewed all the records and awarded only those costs that he was convinced were related to the right leg. And he increased the amount of medical costs awarded by approximately $45,000. On review, the commission, looking at the exact same record that it had previously found was completely devoid of sufficient evidence, now suddenly determined that the record was sufficient to award medical costs and confirm this award. The employer appealed the decision of the commission as to both the permanent total disability and the cost of medical care to the circuit court, which summarily affirmed the commission's decision. We understand that manifest weight is a difficult burden to meet, and that is why we are appealing only the two issues in this case that we believe have significant factual fundamental errors. With respect to the award of permanent total disability, the commission awarded those benefits under the odd lot theory. Surprisingly, however, the commission does not address the two prongs of the odd lot theory that the Weston court has espoused. The Weston court basically said there are two ways to prove an odd lot permanent total. One is to show an unsuccessful job search. The other is to show that your age, training, education, skills, abilities, restrictions, et cetera, are sufficiently limiting that there is no reasonably stable labor market. And the courts have now recently held that generally that requires the testimony of a vocational expert. Petitioner did not have a valid job search. I don't think anyone could argue that nine jobs done in one day by mail over the course of six months constitutes a valid job search. He also obviously did not introduce any vocational expert testimony regarding the general labor market. Instead, the commission engaged in some kind of weighing of how much Petitioner thought he was disabled and what were his really skills and was he retired and a very elusive number of factors. So Wolf was your vocational expert? Yes, he was, Your Honor. Well, didn't Wolf say there's no transferable skills? Yes, Your Honor, but you can be employed without transferable skills. There is a level of work that is sufficiently unskilled that, you know, simply a high school education or certainly a college education can qualify one to be a cashier where you're writing up work slips and adding up numbers. One doesn't necessarily need transferable skills. One would argue that an air traffic controller by definition would have very few transferable skills other than perhaps computer operation because almost nobody else in the industry. So you're saying it was there for the commission to use that language, which they did, in deciding because he needed a vocational expert who said he had no skills that would be marketable in the job market, correct? Correct, Your Honor, because the analysis is not simply do skills from your prior jobs translate over. The analysis is in the whole context of your person, your education, what other hobbies you have, what other experiences you have, what can you qualify for. Transferable skills is only one element of that analysis in a vocational expert's opinion. Isn't that what the commission did, though, was they took all the evidence, including Wolf's testimony, and weighed it and made the determination that the evidence weighed heavier toward him being an odd lot permanent total? That's basically what they said, isn't it? Yes, I think that's what the commission tried to do, and I would respectfully suggest that's not the commission's function. The reason you have a vocational expert testify to that is because the vocational expert will know what the job situation is in that geographic area. For example, David Wolf testified that there would be, or his report indicated there would be a 9% increase each year in cashier positions available in the Kankakee area. That's not the kind of information that's within the purview of the average commissioner. Their job is to weigh that kind of expert testimony. What are the job openings? How many of them are there? Is it a growing industry or a dying industry? What is the wage calculation? What are the range of physical abilities within that job? Some cashiers stand on their feet all day. I'm sure he found auto cashiers, because those are the kind of folks who are sitting behind a counter, writing up work orders, tallying the amount that repairs will cost. So is that what you're pointing to, that the cashier position is the quote-unquote well-known branch of the labor market? Is that? Right. I mean, it's one example, Your Honor. Again, this was only a labor market survey. It was not a vocational expert. This was not a vocational rehabilitation plan in which we could only find nine jobs. This was simply a labor market survey to give a snapshot of one piece of one piece of information. It was not part of the labor market to show that there were jobs out there that he could have considered while he was reviewing the Sunday papers. Turning to the question of whether there's a job he could get, isn't the standard, the person, although not totally incapacitated, is so handicapped that he or she will not be employed regularly at any well-known branch of the labor market will qualify for ADLAT, correct? That is correct, Your Honor. So what's the branch? He might find a job as a cashier. That's all it takes, that he might find a job? Right. I believe, Your Honor, that when you look at cashier positions, cashier positions are involved in every aspect of American life. Pharmacies, retail establishments, car dealerships, anyone that sells anything has a cashier. So we might be expert. Who wouldn't qualify as a cashier, though? I'm sorry, what? Who wouldn't qualify as a cashier or who couldn't qualify as a cashier, then? Someone who had a third-grade education from a non-English-speaking country, someone who was so incapacitated that they were not able to stand for extended periods of time or who had to sit and stand every 10 minutes. I mean, there is no question that there is a difficulty in finding a job when you have restrictions. But wasn't that part of his testimony? He could only stand for short periods of time, 15 to 20 minutes. On good days, he could walk 100 yards. On bad days, he couldn't walk at all. I mean, wasn't that all part of the evidence in this case? Yes, that was his testimony, Your Honor, but that was certainly not the restrictions that were imposed by any of his doctors. That was Petitioner's own self-limiting testimony. Dr. Sheinkopf found that he had an excellent functional result, but very subjective complaints. Every doctor released him to at least sedentary duty, which means that you can sit for extended periods of time, and most of them found him actually capable of doing quite a bit more. And you have a situation in terms of evaluating the validity of that testimony where this gentleman is actually going to receive more than his salary for the rest of his life, tax-free, by making himself into a permanent total. Why wouldn't he have incentive to make himself seem as impaired and disabled as possible in the context of this proceeding? And, of course, the Commission is the original fact-finder who weighs the testimony, and we only reverse if an opposite conclusion is clearly apparent. And I agree with that, Your Honor, but I think that in doing so, the Commission still has to apply the appropriate legal analysis. And in this case, the words, vocational expert testimony, and the words, adequate job search, do not appear anywhere in the Commission's analysis. They just themselves kind of inserted themselves as the vocational expert and decided that in light of all the facts and circumstances,  Thank you, counsel. I'm pleased to court, counsel. My name is Patrick Hanlon. I'm the attorney representing Mr. Clark, the employee. It is our position that the Commission finding that the employee is permanently and totally disabled under an odd lot category should be upheld under a manifest weight of the evidence standard of review. The City of Chicago case cited in the employer's briefs held that whether an employee falls into an odd lot category is a factual determination, which will not be set aside unless it is against the manifest weight of the evidence. We contend that the employee, Mr. Clark, has proved by preponderance of the evidence that he falls in that category, and there's ample evidence in the record to support that finding. The functional capacity evaluation he was ordered to undergo after being released by a surgeon found him in a light to light medium category, but noted that he couldn't walk more than 30 feet at a time without a rest. Dr. Fletcher, the only occupational medicine doctor who examined Mr. Clark, who Mr. Clark was referred to by a surgeon, reviewed the functional capacity evaluation, examined Mr. Clark, and determined that he was at a restricted to a sedentary or sit-down job only. As noted in the records and in his testimony, he has difficulty walking on certain days, cannot walk on a bad day, he's on daily prescription pain and anti-inflammatory medications, and that these are multiple medications taken each day. These are multiple pain and anti-inflammatory medications taken on a daily basis. The vocational rehabilitation counselor retained by the employer, David Wolf, submitted a report and testified that he had no transferable job skills. Also opined that he could not return to work in a driving job with the employer. The testimony of Mr. Clark is also uncontradicted when he testified that when he was released after his functional capacity evaluation and contacted his employer, he told them of his medications and symptoms and he was terminated at that time. It is our contention that all these factors together support the Commission's finding. The Commission stated that due to Mr. Clark's age, his lack of transferable skills, and current physical restrictions and condition, that it weighed heavier against finding a plaintiff employable in a regularly well-known branch of the labor market than would weigh in favor of employment. Isn't that really the problem, the argument here? I mean, transferable skills, so what? I mean, maybe a physicist couldn't have all these skills. You know, there's just no real market for a physicist. But he has core basic skills and skill sets that are easily utilized in a stable labor market. And in this instance, you have sedentary. So what? He's sedentary. Well, he is sedentary, but the Commission is finding, in citing the City of Chicago case, that he is in the odd lot category of permanent disability benefits. In this situation, they looked at his age, which was 64 at the time of the arbitration, his education training experience, which was in a field which he was precluded from going back into, which is air traffic control, because of his age, being over 60. Isn't this really a situation where a guy retires and he's got a part-time job? Isn't that what he really had? Well, I don't know if it qualifies as part-time, but it was a job for reduced pay to earn additional income before he qualifies for his full retirement, and he suffered a significant injury, which prevents him from going back from that job or becoming employed, again, given the multitude of factors in a reasonably stable labor market. In this situation, David Wolf did recommend that he apply for nine jobs. He did a labor market survey and identified nine positions which Mr. Clark did apply for and did not receive any job offers as a result. He scans the papers for jobs that he would fit into due to his known fiscal restrictions as opposed by his doctors and his own knowledge of the situation and has not been able to locate employment. Again, he is an individual of 64 years of age in the Kentucky area with significant health issues and fiscal restrictions, and so many of these cashier positions are not likely to hire someone in that position. So I think he falls into the definition of someone who is in that odd lot who cannot locate employment in a reasonably stable labor market. I didn't understand that. It's not like they hire somebody. What's that? Well, my understanding of the case law is that to prove odd lot entitlement, someone would have to prove that they either, one, engaged in a reasonably diligent job search or that because of his age, education, training, experience, and condition cannot find a job at a reasonably stable labor market. And in this situation, we believe that the commission found by preponderance of the evidence that Mr. Clark fell in that second category and that due to the multitude of factors and weighing them together that he cannot be expected to find a job in a reasonably stable labor market. And we feel that per the manifest way evidence standard that the commission looked at these multitude of factors and made a determination that this decision should not be set aside by the court. Yes, Mr. Clark is not completely fiscally incapacitated, but he does fall within the category of the odd lot category based upon his age, education, training, experience, and medical condition. And that decision by the commission should not be set aside by this court. As to the second part of the decision, the award of medical expenses, in this case, the case was tried in front of Arbitrator Dallesen at arbitration. It was taken up to appeal to the commission, and the commission remanded on simply the issue of the award of medical expenses and said that the record was devoid or lacking of specific findings. At the second arbitration... Well, did it say that or did it say evidence? Well, the commission at the time said that evidence needs to be taken to base an award of medical expenses. The case was taken back then to the arbitration level and assigned to Arbitrator Giordano. And at that time, in his opinion and on the record, it was stated that pursuant to an agreement with the respondent, the employer, petitioner or the employee submits a transcript of evidence on arbitration Now, that record included itemized billing statements, medical records showing dates and types of treatment, and evidence depositions. Arbitrator Giordano then went through that record and made an award of medical expenses and made an attempt to segregate what would be related to... Well, see, I think the problem is maybe the commission inartfully drafted the remand, but it does say what it says. All of that that was stipulated by both parties to submit to the arbitrator, what was new? Well, in this position, we submitted the evidence, deposition testimony, medical records of treatment, itemized billing statements. Our position is what more could we submit? Well, I'm asking what was new. What did the prior arbitrator not have that Giordano had? Nothing. It was the same transcript. Okay, so there was nothing new. Is that the answer? There was nothing new. Okay. And then subsequent to that, the commission, upon review of Arbitrator Giordano's decisions, explicitly noted in their decision that the award of medical expenses per Arbitrator Giordano's decision was supported by the medical records, that the bills were itemized and noted procedures and charges, that the arbitrator compared the bill, date of services to the medical records, dates of service, and found that a sufficient basis for the award of Arbitrator Giordano. They specifically stated that the commission agreed that it was not necessary to take additional evidence as the information contained in the February 9, 2007, transcript. So it's our position that the arbitrator corrected itself and found that the record was not lacking and there's sufficient evidence in there on which to base a decision, which is the typical evidence that's used in most work on compensation cases. Does the commission have done that? Well, it's the commission. Under this fiction we operate on, there's a fact on there. Yeah, they are allowed to know. There's nothing in the record, right? Well, they can look at things de novo. They could review as the fact finder the evidence to decide not to remanded it and then by agreement with the respondent we agreed. Okay, go ahead. By agreement with the respondent we submitted the transcript that had already been developed in the case, all the exhibits that had been submitted at the first arbitration, as evidence on which a decision was requested. In that situation, what more could be offered other than the records of treatment, the itemized bills for that treatment, and the deposition of the treating physicians regarding their treatment? I don't know what more could be offered for a decision to be made. Well, obviously the commission thought there must be by their language they used. They must have thought that the first time, but the second time after reviewing Arbitrator G. O'Donnell's award and scrutinizes his basis for coming up with the award they found it sufficient. Let's put it this way. After an arbitrator did their work for them. I can't comment on that. Now, one thing I would suggest. You can't or you don't want to. Both, Your Honor. One thing I would say and concede is that there are two exceptions in Arbitrator G. O'Donnell's award that do not meet the manifest way to the evidence standard. I point them out in my brief and I want to point to them today. There are two bills from the Oak Orthopedic Clinic for services on October 14 and October 23, 2003 for removal of a mass on his shoulder of $793. That does not meet the standard, and we would suggest that this court reverse that award. Very generous. Secondly, there's another bill from Kankakee Radiology from service on October 14, 2004 for $44 for an x-ray of the left knee, which we would concede, of course, is not related and should be reversed by this court. However, we feel that Mr. Clark is entitled to his permanent and total disability award based upon an ad-lib basis, based upon the manifest way evidence standard review, and based upon the prerogatives of the evidence here and that the commission was correct in their decision and that the commission was also correct in their decision approving the award of Arbitrator G. O'Donnell. Thank you. Thank you, Counsel. Counsel, you may reply. Thank you, Your Honor. Just going briefly to the ad-lib permanent total again, I believe that the burden of proof initially is with Petitioner to establish, I think it's pretty much conceded he didn't do a valid job search, but with respect to the simple analysis of the age, education, experience, Petitioner did nothing beyond adopting, apparently, my expert's testimony. Nobody considered fields such as security, administrative assistance. Those are the kinds of things that are beyond the purview of the commission to weigh itself. They should have had an expert saying, yes, those jobs aren't out there, or no, they aren't. And it was their burden of proof to meet those first two criteria, and I would respectfully suggest they never made their prima facie case pursuant to the Weston decision. With respect to the bills, I was not present at the second set of hearings. My partner, Mr. Vizza, was present and was supposed to argue this today so that he could represent to you first person what occurred. Unfortunately, he's in the hospital, so he's not here. But it is my understanding from him that there was no agreement that the record before Arbitrator Dollison was going to be the whole record before Arbitrator Giordano. My understanding ñ Is there anything in the record that tells us either way about any of what you're telling us now? No, they made no record. I mean, and nobody subsequently filed any affidavits or anything? No. I mean, because the arbitrator made this statement in which he says, pursuant to the agreement with the employer, the claimant submits this transcript of evidence on arbitration as the record on which a decision is requested as to which medical services were reasonable and necessary, et cetera. So it sounds like there was an agreement that that would be the record that the decision would be made on. You're saying there's an ambiguity, it didn't happen that way, but is there anything that shows us anything different? No, there isn't, Your Honor. And I would say what we're saying is exactly that, that there is an ambiguity, that we agreed that that was the record of what was already done that would be used for the next set of hearings, but we never concurred that there would be no further evidence. And in fact, we have no power. It was the Commission who said we need more evidence. The parties would have no power to undo or usurp the Commission's direction to undergo that procedure. We don't have the authority to say, oh, the Commission's wrong. If you anticipated presenting additional evidence and there was an appearance in front of the arbitrator, I mean, and then all of a sudden you got a decision, did you file anything that said, wait a minute, we had more evidence, we thought we were supposed to get to file more evidence? Nothing got filed, did it? No, Your Honor. And I believe that was, again, I wasn't participating in this process, but I believe it was because we had nothing from Petitioner and then apparently we just suddenly had the decision we would anticipate that Petitioner would be moving forward to articulate. And counsel said, what more could have been put in? He took the deposition of the treating doctors. It would have been easy to say, these physical therapy costs, would they have been the same for both the right leg or was it more because of the left leg? He had his medical experts standing there ready to answer these kinds of questions and those questions simply weren't asked. Instead, the Commission has just inferred that the cost of these proceedings, of the treatment, was exactly the same for only one leg as it would have been for two. And additionally, Your Honor, I think we demonstrated, and I won't repeat them, the number of clear errors in the records, including the neuropsychiatric care, that nobody has ever said was causally related to the work accident. In fact, the only two accepted conditions are the embolism and the right knee. All of those costs are included that are clearly, clearly not related to either a right knee or an embolism. And so on its face, the arbitrator is not being completely candid when he says, I reviewed these records and only these costs relate to the right knee. For these reasons, we would ask that Arbitrator Dollison's decision be reinstated. Thank you. Thank you, counsel. Again, for the record, Justice McCullough, Presiding Justice McCullough is a fully participating member of this panel and will participate in the decisions of this Court.